Today's majority would allow a lending institution to foreclose through the use of a "dragnet" (future advance) clause in a prior deed of trust which had been extinguished by operation of law, Miss. Code Ann. § 89-1-49 (1972). The unfortunate result in today's case allows the circumvention of a validly enrolled judgment lien. I therefore feel compelled to dissent.
I am also concerned about the effect the majority opinion will have upon the law and upon the people who check land titles in this state. It is disturbing to think that henceforth one might not be able to check a land title by examining all pertinent records at the county courthouse. Today's majority would cast a shadow of doubt *Page 68 
upon a client's lien position and upon an attorney's ability to certify titles with any degree of certainty.
By clear language, Miss. Code Ann. § 89-1-49 provides that when a debt secured by a deed of trust is paid, the deed of trust isipso facto extinguished. This certainty regarding the status of a land title is crucial in our global financial world, where debts and securities are often transferred to out-of-state lenders.
In today's case, the following significant events, in chronological order, transpired:
 CHRONOLOGICAL CALENDAR OF EVENTS
DATE EVENT ---------------------------------------------------------------------------- April 7, 1978 Gentrys purchased Lot 53, Rosewood Heights Subdivision, and house thereupon. First deed of trust, to Deposit Guaranty Mortgage Company, was signed and duly recorded in land records. This transaction is not involved in today's dispute.
April 8, 1981 First Credithrift Loan: Gentrys borrowed money ($23,679.36) from Credithrift; This second deed of trust (containing a dragnet clause) was signed in favor of Credithrift, and was duly recorded in the land records on April 8, 1981. July 12, 1983 Second Credithrift Loan: A second loan, for $14,150.26, was made by Credithrift to the Gentrys, and the Gentrys signed a new note and deed of trust, which was likewise duly filed and recorded. Credithrift used the proceeds from the new loan to pay off the entirety of the 1981 note secured by the 1981 deed of trust and returned the cancelled 1981 note to the Gentrys. (By operation of § 89-1-49, "payment of the money secured by any mortgage or deed of trust shall extinguish it, and revest the title in the mortgagor as effectually as if reconveyed," so at this time the first (1981) Credithrift deed of trust was extinguished, see § 89-1-49, and all actions on the 1981 deed of trust were barred. § 89-5-21.) September 20, 1984 Valid judgment rendered against Gentrys and in favor of appellant Thomas E. Shutze for $4,541.78. October 23, 1984 Shutze properly entered his judgment lien against Gentrys' property on the Judgment Roll.
— Summer of 1985 — Home-land Title Co. performed title examination prior to Credithrift making its third loan to the Gentrys. Home-land Title Co. failed to discover the 1984 Shutze judgment lien, which had been enrolled October 23, 1984. August, 1985 Third Credithrift Loan: Credithrift made a new loan (for $14,150.26) to the Gentrys. Proceeds from the new loan were used to pay off the 1983 note completely. The 1983 note was cancelled and returned to the Gentrys.
(Thus the 1983 deed of trust was completely extinguished and title revested in the Gentrys as effectually as if reconveyed, see § 89-1-49.) The Gentrys executed a new deed of trust in favor of Credithrift, which was duly recorded in August of 1985. (This new deed of trust ranked behind the 1984 Shutze judgment lien by operation of § 89-5-1, because the 1984 Shutze judgment lien was enrolled prior in time to the recording of the 1985 deed of trust.)
Early 1988 Gentrys moved to California and defaulted on August, 1985, Credithrift loan. Credithrift discovered the intervening 1984 Shutze *Page 69 
DATE EVENT ---------------------------------------------------------------------------- judgment lien enrolled on Judgment Roll and attempted to substitute trustees under 1981 deed of trust, which had already been extinguished, instead of acting under its 1985 deed of trust. July 12, 1988 Credithrift foreclosed on the 1981 deed of trust,
assuming that it had such authority under the dragnet clause of the 1981 (extinguished) deed of trust; Credithrift purchased Gentry house at foreclosure sale for $10,739.65, which was the amount the Gentrys owed on their 1985 note. Credithrift refused to recognize the 1984 Shutze judgment lien, and instead claimed it had priority by virtue of the dragnet clause in the 1981 deed of trust.
 PRIORITY OF LIENS CONTROLLED BY STATUTE
The majority contends that the 1985 loan by Credithrift, consisting of a new note and deed of trust, could be considered an advance under the 1981 deed of trust. This contention is not persuasive because the granting of the new loan in 1985, and the recording of a new deed of trust to secure the loan, by operation of law cancelled and extinguished the 1981 and 1983 deeds of trust, including the dragnet clauses therein contained; indeed, all rights thereunder were barred by operation of law.
Mississippi has a wealth of statutes pertaining to the issues in this action, and such statutes dictate the result we must reach. One such statute provides:
 § 89-1-49. Payment extinguishes mortgage.
 Payment of the money secured by any mortgage or deed of trust shall extinguish it, and revest the title in the mortgagor as effectually as if reconveyed; except, however, that this section shall have no application to security agreements executed under the Mississippi Uniform Commercial Code nor to security interests created by such security agreements.
 SOURCES: Codes, 1880, § 1207; 1892, § 2452; 1906, § 2782; Hemingway's 1917, § 2286; 1930, § 2152; 1942, § 873; Laws, 1968, ch. 495, § 1, eff. from and after March 31, 1968.
Miss. Code Ann. § 89-1-49 (Supp. 1991) (emphasis supplied).
By the clear language of this statute, when the Gentrys paid off their 1981 loan by taking out a new loan in 1983, the 1981 deed of trust, including its dragnet clause, was extinguished asa matter of law, as effectually as if the property had beenreconveyed. Again in 1985, when the Gentrys paid off their 1983 loan by taking out a new loan, the 1983 deed of trust, including its dragnet clause, was extinguished, as effectually as if theproperty had been reconveyed.
Thus, by operation of law, the 1981 and 1983 deeds of trust were no longer in existence, having been completelyextinguished at the time the loan each secured was paid off; therefore dragnet clauses in either of the two previous deeds of trust were likewise extinguished.
The next pertinent statute provides:
§ 89-5-21. Satisfaction to be entered on the record.
Any mortgagee or cestui que trust, or assignee of any mortgagee or cestui que trust, of real or personal estate, having received full payment of the money due by the mortgage or deed of trust,shall enter satisfaction upon the margin of the record of themortgage or deed of trust, which entry shall be attested by the clerk of the chancery court and discharge and release the same,and shall bar all actions or suits brought thereon, and thetitle shall thereby revest in the grantor. And if such mortgagee or cestui que trust, or such assignee, by himself or his attorney, shall not, within one month after request, cancel on the record the said mortgage or deed of trust the beneficiary shall forfeit the sum of fifty dollars, which can be recovered by suit on the part of the party *Page 70 
aggrieved, and if after request, he fails or refuses to make such acknowledgment of satisfaction, the person so neglecting or refusing shall forfeit and pay to the party aggrieved any sum not exceeding the mortgage money, to be recovered by action; but such entry of satisfaction may be made by anyone authorized to do it by the written authorization of the mortgagee or beneficiary, duly acknowledged and recorded, and shall have the same effect as if done by the mortgagee or beneficiary.
SOURCES: Codes, Hutchinson's 1848, ch. 42, art. 1 (33, 34); 1857, ch. 36, art. 14; 1871, § 2297; 1880, § 1206; 1892, § 2451; 1906, § 2781; Hemingway's 1917, § 2285; 1930, § 2155; 1942, § 876; Laws, 1948, ch. 233, § 1.
Miss. Code Ann. § 89-5-21 (Supp. 1991) (emphasis supplied).
Thus the position Credithrift urges today was completelybarred, and the title to the property revested in the Gentrys,the grantors, as a matter of law. Section 89-1-49 is self-executing, and § 89-5-21 further states that all actions are barred thereon, and provides for forfeiture against Credithrift for failure to cancel.
It is elementary that a judgment duly obtained and timely recorded shall be a lien upon all property of the Gentrys within the county where so enrolled, from the date of rendition thereof, and shall have priority according to the order of such enrollment, as provided for by statute:
 § 11-7-191. Lien of enrolled judgment.
 A judgment so enrolled shall be a lien upon and bind all the property of the defendant within the county where so enrolled, from the rendition thereof, and shall have priority according to the order of such enrollment, in favor of the judgment creditor, his representatives or assigns, against the judgment debtor and all persons claiming the property under him after the rendition of the judgment . . .
Miss. Code Ann. § 11-7-191 (Supp. 1991) (emphasis supplied).
Thus the chancellor erred when he held that the dragnet clause in the 1981 deed of trust was effective when in fact it had been completely extinguished by operation of law, Miss. Code Ann. §89-1-49 (Supp. 1991).
 DRAGNET CLAUSE
Each of the three deeds of trust (1981, 1983, and 1985) contained a future advance, or "dragnet," clause. This clause comprised the fourth paragraph on the second page of each deed of trust. Each dragnet clause appeared in small, agate-sized print. There were 20 paragraphs of conditions included in each three-page deed of trust document.
By its own terms this dragnet clause was "optional" rather than "obligatory" because Credithrift, the beneficiary, was to be the sole determiner of whether or not future advances would be made.
The dragnet clause appeared as follows:
 [I]n addition to the indebtedness specifically mentioned above, and any and all extensions or renewals of the same, or any part thereof, this conveyance shall also cover such future and additional advances as may be made to the grantor, or either of them, by the beneficiary, the beneficiary to be the sole judge as to whether or not such extensions or renewals, future and additional advances shall be made. In addition to all of the above, it is intended that this conveyance shall secure, and it does secure any and all debts, obligations, or liabilities, direct or contingent, of the grantor herein, or either of them, to the beneficiary, whether now existing or hereafter arising at any time before actual cancellation of this instrument on the public records of mortgages and deeds of trust, whether the same be evidenced by note, open account, over-draft, endorsement, guaranty, or otherwise.
 OPTIONAL VS. OBLIGATORY ADVANCES
In situations different from the one we face today, but where a prior deed of trust which still secures an unpaid debt remains uncancelled, the distinction between optional and obligatory advance clauses *Page 71 
can determine the outcome, insofar as the interests of lienholders who may have acquired an interest in the land are concerned. An obligatory advance is one which the lender (beneficiary) is bound by contract to make at a later date. However, an optional advance clause is a horse of a different color; the lender (beneficiary) has the discretion to determine at a later date if he wishes to lend more money to the borrower (grantor), and is not bound by contract to make any additional loans. One leading authority has described the difference between optional and obligatory advances as follows:
 So far as enforcement between the parties is concerned, the obligatory-optional distinction is irrelevant. Even if the advance is clearly optional, its acceptance by the mortgagor signifies his willingness to have it included in the mortgage. However, when a subsequent third-party creditor enters the picture, it becomes critically important to determine whether the advance is obligatory or not. The rule widely followed in the United States is this: if the advance is obligatory, it takes its priority from the date of the original mortgage, and the subsequent creditor is junior to it . . . However, if the advance is optional, and if the mortgagee has notice when the advance is made that a subsequent mortgagee or lienor has acquired an interest in the land, then the advance loses its priority to that creditor.
S. Nelson D. Whitman, Real Estate Finance Law 885-86 (2nd Ed. 1985) (footnotes omitted).
There are good reasons for making this distinction between obligatory and optional advances, as explained by this same authority:
 Dragnet clauses are frequently included in the printed language of mortgages drafted by mortgagees. They are seldom the subject of negotiation, and may go entirely unnoticed by the mortgagor until the mortgagee asserts them. The rule making optional advances subordinate to intervening liens is highly relevant in this context. Advances secured by dragnet clauses are almost never obligatory; the only factual issue is generally whether the mortgagee had the requisite notice of intervening liens, and this is usually not hard to determine. Moreover the rule . . . makes rather good sense in the dragnet clause case; in its absence, a mortgagor might naively execute upon his house a mortgage containing a dragnet clause and subsequently find himself locked to that particular lender for the rest of his life.
Id. at 899 (citations omitted).
Regarding the distinction between optional and obligatory future advance clauses, other authorities are in agreement, notwithstanding the comment of Professor Gilmore[1] to the contrary.
 If the limit (in a dragnet clause regarding future advances) be not defined in any way, it can be good only for the advances made at the time, and such others as may afterward be made before any other incumbrances are made upon the property mortgaged. A mortgage *Page 72 
which merely declares that it is to secure such advances as shall thereafter be made by the mortgagee to the mortgagor, or such indebtedness as shall thereafter arise between them, should, it would seem, be held invalid either as against the policy of the law or as constituting evidence of fraud.
1 Jones on Mortgages § 458 (1928) (footnotes omitted).
 ERRONEOUS ASSUMPTION MADE
The majority makes several arguments which do not apply to the case at bar. First, the majority makes this mistaken assumption: "it is apparent Credithrift regarded the refinancing of July, 1983, as a `renewal of the [original] indebtedness' pursuant to the dragnet clause of the April 8, 1981, deed of trust." Later, regarding the 1985 deed of trust, it is stated: "Credithrift again regarded the renewal and advance as within the dragnet clause of the 1981 deed of trust which it in no way cancelled or released, although it did take the precaution of a new deed of trust."
The record does not indicate that Credithrift regarded its refinancing as renewals of prior deeds of trust; indeed, the record indicates that Credithrift thought just the opposite,
that each time the Gentrys borrowed new money, they were required to pay off their prior note, to sign a new note and deed of trust in favor of Credithrift, and each new deed of trust was duly recorded.
Richard D. Scott, manager of Credithrift, appeared as the only witness in the trial below. On cross-examination by Shutze's attorney, Scott testified:
 Q: Would you ever close a loan, say if you had a judgment on the Judgment Roll, and you knew it was there, would you close the loan anyway?
 A: (by Scott:) No.
Transcript, vol. 2, p. 11.
This testimony demonstrates that the parties regarded the 1981 and 1983 deeds of trust as extinguished and cancelled. If the 1985 loan had been secured by the 1981 deed of trust, Manager Scott would have had no reason to let the 1984 Shutze lien prevent him from making a new loan to the Gentrys.
But even if, for the sake of argument, the 1981 note securing the 1981 deed of trust had not been paid, and if the 1983 and 1985 loans had been made, Shutze would still prevail (1) because the dragnet clause in the 1981 deed of trust was "optional" rather than "obligatory;" and (2) because of the intentions of the parties regarding the 1981 dragnet clause.
A dragnet clause should not be given effect if it does not appear that the debt's inclusion in a deed of trust was intended or contemplated by the parties . . . (T)he most important element for a Court to determine is: "What was the intention of the parties when they executed these various instruments?" Matter ofLadner, 50 B.R. 85, 91 (Bankr.S.D.Miss. 1985); Mohler v. BuenaVista Bank Trust Co., 42 Colo. App. 4, 588 P.2d 894 (1978);United States v. American National Bank, 255 F.2d 504 (5th Cir. 1958), cert. denied, 358 U.S. 835, 79 S.Ct. 58, 3 L.Ed.2d 72,rehearing denied, 359 U.S. 1006, 79 S.Ct. 1135, 3 L.Ed.2d 1034.
It is elementary that we will construe a dragnet clause most strongly against the drafter/lender. Trapp v. Tidwell,418 So.2d 786, 792 (Miss. 1982), citing Williams v. Life Ins. Co. ofGeorgia, 367 So.2d 922 (Miss. 1979).
The 1983 and 1985 deeds of trust made no references or other attempts to relate back to, as renewals of, or as future advances under, the 1981 deed of trust. This further evidences the fact that Credithrift regarded the prior deeds of trust as being cancelled upon payment of the underlying debts in 1983 and 1985.
 U.C.C. DOES NOT CONTROL
The majority states: "We perceive no good reason why this legal language should have one meaning and effect where the security is personalty and an altogether different meaning and effect where the security is realty."
The legislature in its wisdom, and for its own reasons, chose to treat real property in *Page 73 
one way and personal property in another. It is not our task to decide the wisdom of the legislature, only to interpret its laws.Marbury v. Madison, 1 Cranch (5 U.S.) 137, 170, 2 L.Ed. 60 (1801).
§ 89-1-49 states unambiguously: "[T]his section shall have no application to security agreements executed under the Mississippi Uniform Commercial Code nor to security interests created by such security agreements." In the Mississippi version of the U.C.C. we find the following:
 § 75-9-102. Policy and scope of chapter.
 (1) Except as otherwise provided in section 75-9-104
on excluded transactions, this chapter applies
 (a) to any transaction (regardless of form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts . . .
Miss. Code Ann. § 75-9-102 (Supp. 1991) (emphasis supplied).
There are no Mississippi cases annotated under the Mississippi Code version of the U.C.C. (Supp. 1991), but a Connecticut case is cited for the proposition that Article 9 of the U.C.C. applies only to the creation of security interests in personal property or fixtures, and is not applicable to the creation of a real estate mortgage. State Nat. Bank v. Dick, 164 Conn. 523,325 A.2d 235 (1973).
Proceeding through the Mississippi version of the U.C.C. we find that Article 9 of the U.C.C. "does not apply: (j) . . . tothe creation or transfer of an interest in or lien on realestate . . ." Miss. Code Ann. § 75-9-104 (Supp. 1991) (emphasis supplied).
By its own definitions and terms, Article 9 of the U.C.C.excludes real property from its coverage. Section 89-1-49, our statute dealing with the extinguishment of real property mortgages upon payment, specifically exempts U.C.C. personalproperty security agreements from its coverage. It is not for this Court to change the law by judicial fiat, and this I would decline to do today.
 LAW HAS CHANGED
Notwithstanding the fact that the prior Gentry deeds of trust were extinguished by operation of law, the majority would have us return to ancient Mississippi case law and breathe life into a decision that was long ago overruled. If this were to be allowed, Credithrift and others neglecting to do business properly under the laws of our state would be rewarded, and those who properly check land and judgment records may well have wasted their time and money.
In justification for this, the majority states:
 It is true that Miss. Code Ann. § 89-5-21 (1972) requires one such as Credithrift to cancel its deed of trust upon its receipt of "full payment of the money due by the mortgage or deed of trust." The 1985 renewal no doubt "paid" the earlier note in a formalistic sense, but it was hardly "full payment" within the language of the deed of trust nor the imperatives of § 89-5-21. See Whiteway Finance, 434 So.2d at 1353.
Again I beg to differ. Credithrift prepared all of theinstruments and was in complete control of all aspects of thetransactions in question, "formalistic" or otherwise.
Credithrift was in control of whether the new loans were renewals of prior debts or new transactions. Credithrift chose to structure these transactions in such a manner as to exchange the old notes for new ones. Credithrift chose to receive and record a new deed of trust after each transaction. Credithrift could have made renewals of the old loans, instead of structuring the transactions as it did. These are exactly the types of transactions §§ 89-1-49 and 89-5-21 were designed to prevent from occurring.
The majority makes much ado about citations to old cases. I see no problem with citations to cases decided long ago, as long as the cases are still good law. However, such is not the case today, as the majority puts great weight upon a case which was overruled in 1949. *Page 74 
The case in question is Witczinski v. Everman, 51 Miss. 841
(1876), which held that optional future advance clauses will be enforced over the rights of later lien creditors. Of course,this rule was never applied when the prior deed of trust hadbeen extinguished by payment in full of the underlying debt.Witczinski is easily distinguished from the case at bar becauseWitczinski dealt with a debt which was still owing at the moment the third party became involved.
However, the law as defined and interpreted by our courts is ever fluid and is constantly changing to meet the needs of new generations of citizens and to adapt to modern behavior and business practices. Witczinski was overruled in 1949 by Northv. J.W. McClintock, Inc., wherein we find the following:
 As to the applicable law, it is said in 36 Am.Jur. p. 808, Par. 234, "The greater array of authority, however, is found on the side of the doctrine that advances made after notice of subsequent interests do not have priority over such interests." The rule is re-announced in 45 Am.Jur. p. 473, Par. 96. The rule is stated in 59 C.J.S., Mortgages, Section 230, page 299, in this language: "In accordance with the general rule, after notice of the attaching of a junior lien, the senior mortgagee ordinarily will not be protected in making further advances under his mortgage given to secure such advances, at least, where he was under no binding engagement to make such advances." These pronouncements have reference to actual notice. Neither Gray v. Helm, 60 Miss. 131, nor Liberty Mercantile Co. v. Allen, 134 Miss. 354, 98 So. 774, announces a different rule. In both cases the mortgage contract obligated the mortgagees to make future advances. However, in the case at bar the provision for advances was a blanket provision. It in no way bound the mortgagee to advance further money. Such advancement was purely optional with McClintock. . . . Neither party had it in mind. . . . We think the announced rule is just and equitable. The only amount named in the McClintock trust deed was $500.00. McClintock was not obligated to advance any more. If he then had actual knowledge Harper had given another a trust deed on the same property, he should have declined to make further advances, but having done so, his security became second to the lien he knew was on the mortgaged property. We adopt the stated rule as being equitable and just. It is uncertain from the report of the case of Witczinski v. Everman, 51 Miss. 841, whether it announces a different rule than the one here adopted. We have been unable to find the original record.
North v. J.W. McClintock, Inc., 208 Miss. 289, 299-300,44 So.2d 412 (1949).
Furthermore, lest there be any doubt, Justice Alexander, the dissenter in North, stated:
 The majority opinion adopts a rule which concededly is not unjust and which is in line with the majority of the courts. The trouble here is that it is out of accord with Witczinski v. Everman, 51 Miss. 841.
 * * * * * *
 If the Court desires to adopt the rule announced, it seems to me that there should be a forthright overruling of the Witczinski case. I would, therefore, be in a position to concur in the result reached were it not for my conviction that it involves a departure from our former decision upon the subject, and since I do not believe that the Witczinski case ought to be overruled, but that this has at least impliedly been done, I cannot consistently join in the majority opinion.
North, 208 Miss. at 301-02, 44 So.2d 412 (Alexander, J., dissenting) (emphasis supplied).
Whiteway Finance Co. v. Green, 434 So.2d 1351 (Miss. 1983) is trumpeted by the majority as demonstrating that this court has returned to the Witczinski principles which North had overruled. Nowhere in Whiteway is Witczinski even mentioned.Whiteway may be distinguished on its facts, for it involved a scenario far different *Page 75 
from Witczinski and different from the case at bar.
In Whiteway, the debtor obtained a loan which he secured with a deed of trust containing a dragnet clause. He then conveyed the property to his father. While concealing the fact that he nolonger owned an interest in the personal property, the debtor "flipped" the original loan, paying off the old note and signing a new deed of trust on the same property. It is easy to understand how this court could decide that the finance company, and not the debtor's father, should enjoy priority in such circumstances, for the equities undoubtedly favored the lender on that day.
The facts are significantly different in the case sub judice.
The equities would favor Shutze, who spent his own time and money to obtain a valid judgment against the Gentrys, and then to enroll it properly at the county courthouse. Whiteway is in no way analogous to the case at bar, because the debtor inWhiteway actively defrauded the lender when he secured his second loan and signed a deed of trust on property he had previously conveyed to his father. There is nothing in the record before us that would indicate that Shutze in any way attempted to mislead or defraud anyone, nor is there any indication that the Gentrys misrepresented to Credithrift the fact that a judgment lien had been enrolled upon their property between the time of the 1983 loan and the 1985 loan.
 ACTUAL NOTICE OF JUDGMENT LIEN
The lower court found that Credithrift had "no actual notice" of the Shutze judgment, and weighed this in Credithrift's favor. Again, we believe the chancellor below erred in so finding.
It is firmly etched into Mississippi jurisprudence that since the recording of the judgment lien was "notice to the world," Credithrift was deemed to be on notice of the Shutze lien, and ignored such lien at its own peril, notwithstanding the failure of the title company to discover the lien. Simmons v.Hutchinson, 81 Miss. 351, 356-57, 33 So. 21, 22 (1902).
Credithrift paid Home-land Title to search the record before executing the 1985 loan to the Gentrys. The title company failed to discover the Shutze lien on the judgment roll, where it had been properly enrolled by Shutze. The chancellor took the position that since Home-land, acting for Credithrift, failed to discover the Shutze judgment lien, and therefore Credithrift had no actual notice thereof, this failure should excuse Credithrift from being subject to the Shutze judgment lien. This is directly contrary to our statute:
 A judgment so enrolled shall be a lien upon and bind all the property of the defendant within the county where so enrolled . . . and shall have priority according to the order of such enrollment.. . .
Miss. Code Ann. § 11-7-191 (Supp. 1991) (emphasis supplied).
Thus the chancellor erred as a matter of law. This requires reversal. To affirm the chancellor would be to destroy Shutze's judgment lien position, which is secured to him by clear statutory mandate.
Before the execution of the 1985 loan, Credithrift had a prior in time, and therefore superior, lien to Shutze because Credithrift's 1983 deed of trust was entered into the public record prior in time to the 1984 Shutze judgment lien. Miss. Code Ann. §§ 11-7-191 ("A judgment . . . shall have priority according to the order of such enrollment"); 89-5-1 ("priority of time of filing shall determine the priority of all conveyances of the same land"); 89-5-3 ("priority thereof shall be governed by the priority in time of filing"); 89-5-5 ("priority thereof shall be governed by the priority in time of the filing").
The 1985 deed of trust was valid, but since it was enrolledlater in time, the 1985 deed of trust was therefore subject to, and junior to, Shutze's 1984 judgment lien as a matter of law. Miss. Code Ann. §§ 11-7-191, 89-5-1, and 89-5-5 (Supp. 1991). Therefore the 1985 transaction is by nine months a junior lien and is subject to Shutze's 1984 judgment lien, which was duly enrolled. *Page 76 
When the 1981 and 1983 debts were paid off, the 1981 and 1983 deeds of trust became completely extinguished and inoperative because they secured nothing. Therefore all rights or actions thereunder were barred by statute.
I would reverse and enter judgment here for the appellant on the issue of the priority of the Shutze lien, but remand to the chancery court of Forrest County, Mississippi, for such further and necessary proceedings consistent with this opinion. Accordingly I respectfully dissent.
HAWKINS, P.J., and PITTMAN and McRAE, JJ., join this dissent.
[1] . . . Professor Grant Gilmore has argued that this very uncertainty is the principle [sic] virtue of the rule:
 Nevertheless, the conceptually nonsensical distinction between "obligatory" and "voluntary" has had the result (which is not in the least nonsensical) of preserving (or creating) a wide area of judicial discretion. There are few, if any, future advance clauses which an astute judge cannot, at will, classify on one side or the other of the line between obligatory and voluntary. When he has picked his label, he has also picked his priority rule . . . Only a very wise or a very foolish man would be willing to state, categorically, where the truth lies and to propose a rule for application in all possible situations. There is, then, much to be said for having no rule at all, or only a make-believe rule, and for letting the judges decide; judges are not necessarily wiser than other people, but they are paid to decide things.
[G. Gilmore, Security Interests in Personal Property § 35.4 (1965).]
Gilmore's argument is appealing but ultimately unconvincing. The cost of learning the answer in a particular case, stated in terms of attorney's fees, court costs, and the time of witnesses, is far too high. A rule which could be applied with certainty, whatever its context, would be preferable.
G. Nelson D. Whitman, Real Estate Finance Law 888-89 (2nd Ed. 1985).